IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Jeramy Michael Lee,<br><br>               Plaintiff,<br><br>    vs.<br><br>Michael J. Astrue,<br>Commissioner of Social Security,<br><br>               Defendant. | Civil Action No. 6:11-1518-TMC-KFM<br><br>**REPORT OF MAGISTRATE JUDGE** |

       This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) DSC, concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

       The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

## ADMINISTRATIVE PROCEEDINGS

       The plaintiff filed applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") benefits on October 16, 2008, respectively, alleging that he became unable to work on August 26, 2006. The applications were denied initially and on reconsideration by the Social Security Administration. On October 13, 2009, the plaintiff requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Ms. Jabron, an impartial vocational expert, appeared on June 29, 2010, considered the

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

case *de novo*, and on July 1, 2010, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when it was approved by the Appeals Council on May 23, 2011. The plaintiff then filed this action for judicial review.

In making his determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> 1. The claimant has not engaged in substantial gainful activity since October 16, 2008, the application date. (20 C.F.R. § 416.971 *et seq.*).
>
> 2. The claimant has the following severe impairments: status post parietoccipital contusion and right frontal traumatic subarachnoid hemorrhage; and borderline intellectual functioning (20 C.F.R. § 416.920(c)).
>
> 3. The claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925 and 416.926).
>
> 4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 C.F.R. § 416.967(c). Specifically, the claimant is able to lift and carry up to 50 pounds occasionally and 25 pounds frequently and stand, walk, and sit for 6 hours each in an 8-hour day. The claimant cannot perform any climbing and can balance occasionally. He is also limited to simple unskilled work.
>
> 5. The claimant is capable of performing past relevant work as a dishwasher. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. § 416.965).

> 6. The claimant has not been under a disability, as defined in the Social Security Act, since October 16, 2008, the date the application was filed (20 C.F.R. § 416.920(f)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. § 404.1520. If an individual is found not disabled at any step, further inquiry is unnecessary. *Id.* § 404.1520(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually

3

performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that his

conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## **EVIDENCE PRESENTED**

The plaintiff, who was born in 1979, is a younger individual with a ninth grade education and past work experience as a dishwasher and construction worker (Tr. 111, 139, 142). He was injured in August 2006 during an assault, which resulted in a closed head injury and a cut over his right eye, and he was brought to the emergency department of the Medical University of South Carolina ("MUSC ER") (Tr. 199-302). He was diagnosed with a traumatic subarachnoid hemorrhage and traumatic subdural hematoma and admitted to the intensive care unit (Tr. 214). He was hospitalized for six weeks and then participated in two months of physical rehabilitation (Tr. 386).

On November 19, 2007, the plaintiff presented to the Roper St. Francis emergency department ("Roper ER") reporting vomiting lasting one week. Notes show that he had previously been seen at the Summerville Medical Center and was told that he had tested positive for hepatitis B. His notes from Roper reflected a diagnosis of hepatitis. He was advised to follow up with Dr. Schnell's (gastroenterologist) office (Tr. 376-79).

On November 29, 2007, the plaintiff presented to Roper ER with a headache and vomiting (Tr. 369-70). He had not followed up with Dr. Schnell because he lost the phone number. He was diagnosed with hepatitis and vomiting and again referred to Dr. Schnell.

On December 15, 2007, the plaintiff presented to Roper ER with a headache status post head injury one year prior (Tr. 361-62). He reported having "bad headaches" twice a week. Neurological exam was normal. He was given a Toradol and Phenergan injection. Diagnosis was acute headache.

5

The plaintiff presented to Roper ER on February 29, 2008, with vomiting and diarrhea. He requested a doctor's excuse for work (Tr. 352-53). On March 20, 2008, the plaintiff presented to MUSC ER with right hand pain. He was diagnosed with a right hand contusion after being involved in a fight at a concert (Tr. 304-305).

The plaintiff presented to Roper ER on July 23, 2008, with neck pain but no direct injury to neck or head. He reported falling off of a ladder. Neurological exam was normal. He was diagnosed with neck strain (Tr. 342-43). Cervical spine x-ray was negative for acute bony injury and showed reversal of normal cervical lordosis (Tr. 348).

On September 4, 2008, the plaintiff was again seen at the MUSC ER with a neck laceration and right hand pain after an assault. He reported headache, loss of consciousness, and TMJ pain. Neurological exam was normal. He was diagnosed with contusion and laceration following an assault. The laceration did not need closure (Tr. 304-305), and a brain CT scan was normal (Tr. 309).

On November 26, 2008, the plaintiff presented to Roper ER with neck pain. He was lifting/moving a stove two days ago when he felt a burning sensation in his upper back. On examination, there was no midline tenderness or radiation. There was decreased rotation of neck due to pain and tenderness to base of neck near scapula. He was given a Toradol injection and prescribed Motrin and Flexeril. He was to follow up with Hope or Fetter Clinic (Tr. 334-35).

Mark McClain, Ph.D., performed a psychological evaluation of the plaintiff in January 2009 (Tr. 386-90). The plaintiff reported that he dropped out of school in the ninth grade, was placed in special education classes for behavior problems, and had not received a high school equivalent diploma. The plaintiff last worked at Goodwill Industries through vocational rehabilitation, but he quit because he said he was unable to keep up (Tr. 386). He reported he was able to care for his personal needs and perform activities of daily living independently. He could recognize and avoid physical danger and follow simple directions,

but sometimes forgot directions or lost objects. He reported having problems reading, writing, and performing arithmetic (Tr. 387). Dr. McClain administered two objective tests and determined that the plaintiff's scores placed him in the borderline range of intelligence (Tr. 388). On the Wide Range Achievement Test, he was equivalent to fourth grade reading and second grade spelling and arithmetic. Based on the objective tests and clinical interview, Dr. McClain found no clinical mental disorder (Axis I). He diagnosed the plaintiff with borderline intellectual functioning and assigned a Global Assessment of Functioning ("GAF") rating of 70, which was the high end of the range for having some mild symptoms or some difficulty in social, occupational, or school functioning. *See* American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed., text revision 2000) (DSM-IV-TR). Dr. McClain opined that the plaintiff's performance on the objective tests suggested that the plaintiff might be able to develop the skills necessary to independently manage simple finances in the future (Tr. 389).

A Physical Residual Functional Capacity ("RFC") assessment completed by a state medical consultant on February 11, 2009, found the plaintiff capable of a full range of light work (Tr. 391-98). A second state consultant completed a Psychiatric Review Technique Form ("PRTF") dated February 17, 2009, and concluded that the plaintiff's borderline intellectual functioning was not listing level severity (Tr. 399-412). The plaintiff was assessed as having mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulty in maintaining concentration, persistence, or pace. It was noted that he was fired from work due to tardiness. Field office observations indicated he was difficult to understand, and he could not remember many dates or information. He had a history of special education and limited work experience. It was not clear how much his traumatic brain injury had affected him. After concluding that the plaintiff was capable of simple, unskilled work, the consultant added the following comment:

7

> It is of concern that it appears that he does not want to work and that he becomes so easily fatigued. At his young age if he does not work the prognosis for his recovery will be poor. It is strongly suggested that he become actively involved in job training. It would also benefit him to have some counseling to assist his with processing his situation and enhancing his motivation.

(Tr. 411).

A Mental RFC form completed on February 17, 2009, indicated that the plaintiff was able to understand and remember simple instructions, sustain appropriate attention for simple, structured tasks, tolerate co-workers and supervisors, adapt to changes if they are slow and gradual, maintain appropriate appearance, accept supervision, and make simple decisions (Tr. 414-16).

On June 24, 2009, Dr. Istvan Takacs of the Neurosurgery Clinic at MUSC noted the plaintiff had not been seen since February 7, 2007 (Tr. 417-18). Dr. Takacs noted that the plaintiff was physically recovered but was mentally severely impaired. He had a follow up CT scan that was unremarkable. According to his mother, he had not been able to hold down a job, continued to sleep a good part of the day, could not concentrate, wandered off, and was not able to participate in any activities for any length of time. Dr. Takacs promised to set the plaintiff up for a formal psychiatric evaluation to establish proper disability status. In a Physician's Report completed on June 24, 2009, Dr. Takacs reported the plaintiff had been receiving treatment for a diffuse brain injury since August 26, 2006 (Tr. 169). Dr. Takacs stated the plaintiff had made a strong physical recovery but cognitively he was severely impaired with reduced reasoning, concentration, and stamina. Dr. Takacs opined that the plaintiff's impairments were permanent.

A second PRTF dated October 9, 2009, also found that the plaintiff's borderline intellectual functioning was not listing level severe (Tr. 431-44). The examiner concluded that there was "not enough current and updated information about his

8

functioning at this time." A Physical RFC assessment found the plaintiff capable of light work as of October 13, 2009 (Tr. 445-52).

The plaintiff appeared with counsel and testified at the June 2010 hearing before the ALJ (Tr. 27-32). He said he washed dishes at a hotel for three months and framed houses before that (Tr. 27, 29). He lived with his mother and brother (Tr. 28). He said he had difficulty remembering, paying attention, and concentrating (Tr. 29-30). He spent most of his time lying down because his head hurt and his ears rang. He said his mother cared for him (Tr. 31).

The plaintiff's mother also testified at the hearing (Tr. 32-38). She said her son moved in with her in 2006, after his injury. She said he had difficulties with short term memory (Tr. 33). She estimated that the plaintiff had the mental capacity of a nine- to 12-year-old child, and he had difficulty following instructions (Tr. 34-35).

In addition, Ms. Jabron testified as a vocational expert at the hearing (Tr. 38-41). She classified the plaintiff's past work as a dishwasher as medium, unskilled work and his work as a construction laborer as heavy, unskilled work (Tr. 39). Although the plaintiff only worked as a dishwasher for three months, Ms. Jabron testified that because the job was unskilled, the plaintiff could have learned the skills in one month or less (Tr. 39-40). Ms. Jabron testified that an individual who was the same age as the plaintiff, with the same education and work experience, who could perform simple, unskilled medium work, with no climbing and occasional balancing, could perform the plaintiff's past work as a dishwasher (Tr. 40). She also cited other simple, unskilled, medium jobs that such an individual could perform: janitor (68,000 jobs in South Carolina, 3,432,000 jobs in the United States); warehouse worker (36,200 jobs in South Carolina, 2,220,000 jobs in the United States), and laundry service tagger (2,520 jobs in South Carolina, 136,000 jobs in the United States) (Tr.

9

40-41). Ms. Jabron testified that her testimony was consistent with the *Dictionary of Occupational Titles* ("*DOT*") (Tr. 41).[2]

**ANALYSIS**

The plaintiff alleges disability commencing August 26, 2006, at which time he was 27 years old. He has a limited education and past relevant work as a dishwasher and a construction worker. The ALJ found that the plaintiff's head and eye injuries and his borderline intellectual functioning were severe impairments (Tr. 13-14). The ALJ further determined that the plaintiff could perform simple, unskilled medium work with no climbing and occasional balancing and that he could perform his past work as dishwasher. The plaintiff argues that the ALJ erred by (1) performing a flawed listing analysis; (2) performing a flawed credibility analysis; and (3) failing to perform a proper RFC analysis.

*Listing Analysis*

The plaintiff argues that the ALJ performed a flawed listing analysis for Listing 12.02 (pl. brief 9-11). The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. § 404.1520(d). A listing analysis includes identifying the relevant listed impairments and comparing the criteria with the evidence of the plaintiff's symptoms. See *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination"); *Beckman v. Apfel*, C.A. No. WMN-99-3696, 2000 WL 1916316, *9 (D. Md. 2000) (finding that where there is "ample factual support in the record" for a particular listing, the ALJ should perform a listing analysis).

Listing 12.02 *Organic Mental Disorders* provides as follows:

Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or

---

[2] U.S. Dept. of Labor, *Dictionary of Occupational Titles* (4th ed., Rev. 1991).

10

laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:

    1. Disorientation to time and place; or

    2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

    3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

    4. Change in personality; or

    5. Disturbance in mood; or

    6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

    7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria–Nebraska, Halstead–Reitan, etc.;

AND

B. Resulting in at least two of the following:

    1. Marked restriction of activities of daily living; or

    2. Marked difficulties in maintaining social functioning; or

    3. Marked difficulties in maintaining concentration, persistence, or pace; or

> 4. Repeated episodes of decompensation, each of extended duration;

OR

C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. Part 404, Subpt. P, App. 1, § 12.05.

The ALJ found that the plaintiff's mental impairment did not meet or medically equal the criteria of Listing 12.02. The ALJ specifically noted that the plaintiff did not meet the "paragraph B" criteria, finding the plaintiff had mild restriction in activities of daily living, moderate difficulties in social functioning, moderate difficulties with regard to concentration, persistence, or pace, and no episodes of decompensation (Tr. 14-15). The ALJ cited to the exhibits in the record supporting his findings. He noted that upon consultative examination in January 2009, the plaintiff reported that he was able to care for his personal needs and perform activities of daily living independently (Tr. 14, 386-90). In finding that the plaintiff had moderate difficulties in social functioning, the ALJ noted the plaintiff had been involved in a gang assault in 2006 and had been convicted of marijuana trafficking and imprisoned in February 2007 (Tr. 14). In finding the plaintiff had moderate difficulties with regard to concentration, persistence, or pace, the ALJ noted that the plaintiff reported he could follow

simple directions but sometimes forgot directions or lost objects and also cited the plaintiff's mother's report that the plaintiff had trouble concentrating (Tr. 15, 33, 387, 417). As noted by the Commissioner, Michael Neboschick, Ph. D., completed a PRTF in February 2009 and opined that the plaintiff had mild limitations in his activities of daily living and in social functioning, moderate limitations in concentration, persistence, or pace, and no episodes of decompensation (Tr. 409). As discussed above, the ALJ's findings were the same except that he found the plaintiff had moderate rather than mild limitations in social functioning (Tr. 14).

The ALJ also considered the "paragraph C" criteria and found that they were not satisfied (Tr. 15). Dr. Neboschick also found that the plaintiff did not meet the "paragraph C" criteria (Tr. 410). Moreover, as argued by the Commissioner, the disability determination and transmittal forms signed by the State agency physicians provided the required medical opinion that the plaintiff's impairments did not equal a listed impairment (Tr. 43-51). *Smith v. Astrue*, No. 11-1574, 2011 WL 6188731 at * 1 (4th Cir. Dec. 14, 2011) (citing SSR 96-6p, 1996 WL 374180, at *3).[3]

---

[3]This ruling states in pertinent part:
>The signature of a State agency medical or psychological consultant on an SSA-831-U5 (Disability Determination and Transmittal Form) . . . ensures that consideration by a physician (or psychologist) designated by the Commissioner has been given to the question of medical equivalence at the initial and reconsideration levels of administrative review. Other documents, including the Psychiatric Review Technique Form and various other documents on which medical and psychological consultants may record their findings, may also ensure that this opinion has been obtained at the first two levels of administrative review.
>
>When an administrative law judge or the Appeals Council finds that an individual's impairment(s) is not equivalent in severity to any listing, the requirement to receive expert opinion evidence into the record may be satisfied by any of the foregoing documents signed by a State agency medical or psychological consultant.

SSR 96-6p, 1996 WL 374180, at *3.

Based upon the foregoing, this court finds that the ALJ's listing analysis is supported by substantial evidence and is free of legal error.

*Credibility*

The plaintiff next argues that the ALJ failed to properly consider his credibility. The Fourth Circuit Court of Appeals has stated as follows with regard to the analysis of a claimant's subjective complaints:

> [T]he determination of whether a person is disabled by pain or other symptoms is a two-step process. First, there must be objective medical evidence showing the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged. . . . It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated.

*Craig v. Chater*, 76 F.3d 585, 593, 595 (4th Cir. 1996). A claimant's symptoms, including pain, are considered to diminish his capacity to work to the extent that alleged functional limitations are reasonably consistent with objective medical evidence and other evidence. 20 C.F.R. §§ 404.1529(c)(4) and 416.929(c)(4). Furthermore, "a formalistic factor-by-factor recitation of the evidence" is unnecessary as long as the ALJ "sets forth the specific evidence [he] relies on in evaluating the claimant's credibility." *White v. Massanari*, 271 F.3d 1256, 1261 (10th Cir. 2001). Social Security Ruling 96-7p states that the ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." 1996 WL 374186, at *4. Furthermore, it "must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and reasons for that weight." *Id.*

The factors to be considered by an ALJ when assessing the credibility of an individual's statements include the following:

14

(1) the individual's daily activities;

(2) the location, duration, frequency, and intensity of the individual's pain or other symptoms;

(3) factors that precipitate and aggravate the symptoms;

(4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

(5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

(6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

(7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

*Id.* at *3.

The ALJ noted the plaintiff's testimony and his mother's testimony and found that while the plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, the plaintiff's statements concerning the intensity, persistence, and limiting effects were not fully credible (Tr. 16). The plaintiff argues that the ALJ relied exclusively on objective medical evidence and did not consider any of the above factors (pl. brief 12-13). However, the ALJ specifically noted in his credibility analysis that the plaintiff reported that he could perform activities of daily living independently and that he was not being prescribed any medications for medical or mental health issues (Tr. 17).

In *Hines v. Barnhart*, 453 F.3d 559 (4th Cir. 2006), a Fourth Circuit Court of Appeals panel held, "Having met his threshold obligation of showing by objective medical evidence a condition reasonably likely to cause the pain claimed, [the claimant] was entitled to rely exclusively on subjective evidence to prove the second part of the test, i.e., that his

pain [was] so continuous and/or severe that it prevent[ed] him from working a full eight-hour day." 453 F.3d at 565. However, the court in *Hines* also acknowledged that "'[o]bjective medical evidence of pain, its intensity or degree (i.e., manifestations of the functional effects of pain such as deteriorating nerve or muscle tissue, muscle spasm, or sensory or motor disruption), if available should be obtained and considered.'" *Id.* at 564 (quoting SSR 90-1p).

> The court further acknowledged:
>
> While objective evidence is not mandatory at the second step of the test, "[t]his is not to say, however, that objective medical evidence and other objective evidence are not crucial to evaluating the intensity and persistence of a claimant's pain and the extent to which it impairs her ability to work. They most certainly are. Although a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers."

*Id*. at 565 n.3 (quoting *Craig v. Chater*, 76 F.3d 585, 595 (4th Cir. 1996)). *See Johnson*, 434 F.3d at 658; 20 C.F.R. § 404.1529(c)(2) ("We must always attempt to obtain objective medical evidence and, when it is obtained, we will consider it in reaching a conclusion as to whether you are disabled. However, we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work solely because the available objective medical evidence does not substantiate your statements."); SSR 96-7p, 1996 WL 374186, at *6 ("[T]he absence of objective medical evidence supporting an individual's statements about the intensity and persistence of pain or other symptoms is only one factor that the adjudicator must consider in assessing an individual's credibility and must be considered in the context of all the evidence.").

16

The plaintiff argues that the ALJ's "entire credibility analysis . . rests on a conjecture by Dr. McClain that [the plaintiff] may be able to manage his finances in the future, and [the plaintiff's] incarceration in 2007 (pl. brief 12). This court disagrees. In addition to the above factors, the ALJ considered the medical evidence of record, including the opinion of Dr. Takacs, a treating physician. The ALJ noted that Dr. Takacs reported the plaintiff was physically recovered from the injury and that follow up CT scans were unremarkable. The ALJ also cited Dr. Takacs' conclusion that the plaintiff was still mentally severely impaired. However, the ALJ noted that the opinion gave little insight into the plaintiff's functional limitations. Like Dr. Takacs, the ALJ concluded that the plaintiff's borderline intellectual functioning was a severe impairment, and although he found the impairment did not arise to the level of a disabling impairment, the ALJ limited the plaintiff to simple, unskilled work[4] to accommodate the plaintiff's condition (Tr. 17). The ALJ additionally limited the plaintiff to no climbing and only occasional balancing to accommodate his head injury (Tr. 17-18).

The ALJ considered the opinion of Dr. McClain, a psychologist who performed a consultative examination of the plaintiff in January 2009. The ALJ noted that the plaintiff's GAF score of 70 "represented some mild symptoms or some difficulty in social occupational, or school functioning but generally functioning pretty well overall" (Tr. 17). While the plaintiff argues that Dr. McClain's opinion that the plaintiff may be able to develop the skills necessary to manage simple finances independently in the future was "conjecture," the opinion was that of a specialist and was based on legitimate, nationally recognized objective tests and his clinical interview (Tr. 386-90).

The plaintiff further argues that the ALJ erred in relying on the plaintiff's 2007 incarceration to support his credibility finding. However, the ALJ's statement was simply,

---

[4]"Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time." 20 C.F.R. § 416.968(a).

and correctly, that the plaintiff "is ineligible for disability benefits during the time period of his incarceration" (Tr. 17) (citing 20 C.F.R. § 416.211 (stating "you are not eligible for SSI benefits for any month throughout which you are a resident of a public institution . . . ").

Based upon the foregoing, the ALJ's credibility finding is based upon substantial evidence and is free of legal error.

*Residual Functional Capacity*

Lastly, the plaintiff argues that the ALJ failed to perform a proper RFC analysis. Social Security Ruling 96-8p, 1996 WL 374184, provides:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

*Id.* at *7 (footnote omitted). Further, "[t]he RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence." *Id.*

The ALJ found that the plaintiff retained the ability to perform simple, unskilled medium work with no climbing and occasional balancing (Tr. 15). The ALJ specifically linked the limitations he found with the evidence of record. He limited the plaintiff to no climbing and only occasional balancing due to plaintiff's head injury and subsequent falls from a ladder on at least two occasions (Tr. 17), and he limited the plaintiff to simple, unskilled work based on his reports to Dr. McClain and Dr. McClain's objective tests that indicated borderline intellectual functioning (Tr. 17). The ALJ further explained that the

18

limitation to medium work accommodated the plaintiff's head injury and accounted for his treating physician's opinion that he had physically recovered from that injury (Tr. 17).

The plaintiff's argument that the ALJ erred at step four when he determined that the plaintiff could perform his past work as a dishwasher is also without merit. The plaintiff asserts that "the ALJ inexplicably found that [the plaintiff] was capable of returning to his past relevant work" (pl. brief 13) However, the record contains vocational expert testimony that supports the ALJ's finding. *See* 20 C.F.R. § 416.960(b)(2) ("a vocational expert . . . may offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s) can meet the demands of the claimant's previous work, either as the claimant actually performed it or as generally performed in the national economy). Here, the vocational expert testified that an individual who was the same age as the plaintiff, with the same education and work experience, who could perform simple, unskilled medium work, with no climbing and occasional balancing, could perform the plaintiff's past work as a dishwasher (Tr. 39-40). The vocational expert's testimony constituted substantial evidence to support the ALJ's finding that the plaintiff could perform his past relevant work.

Based upon the foregoing, this allegation of error is without merit.

## **CONCLUSION AND RECOMMENDATION**

This court finds that the Commissioner's decision is based upon substantial evidence and free of legal error. Now, therefore, based upon the foregoing,

IT IS RECOMMENDED that the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald  
United States Magistrate Judge

September 20, 2012  
Greenville, South Carolina